# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT MIRANDA, ) | 1:08-CV-00696 AWI JMD HC |
| ) | |
| Petitioner, ) | FINDINGS AND RECOMMENDATION |
| ) | REGARDING PETITION FOR WRIT OF |
| v. ) | HABEAS CORPUS |
| ) | |
| RICH SUBIA, ) | |
| ) | |
| Respondent. ) | |
| ) | |

Robert Miranda ("Petitioner") is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**PROCEDURAL HISTORY**

Petitioner is currently incarcerated at Mule Creek State Prison in Ione, California. (Pet. at 1). Petitioner's custody arose from a judgement of the Tulare County Superior Court. (Id at 2). Petitioner was convicted on September 5, 2006, of one count of misdemeanor battery (Cal. Penal Code § 242), one count of felony rape by force or fear (Cal. Penal Code § 261(a)(2)), and three counts of forcible oral copulation (Cal. Penal Code § 288(c)). (Lod. Doc. 5 at 1-2). Petitioner was sentenced to an aggregate prison term of twenty-six years, consisting of an upper term for the felony rape count and midterms for three counts of forcible oral copulation.

Petitioner appealed his conviction to the California Court of Appeal, Fifth District. (Pet. at 2). The Court of Appeal issued a reasoned opinion on March 21, 2007, affirming Petitioner's conviction but vacating Petitioner's sentence for the felony rape count. (*See* Lod. Doc. 5).

Petitioner subsequently filed a petition for review to the California Supreme Court on March 23, 2007. (Lod. Doc. 6). The State high court granted review on June 20, 2007. (Lod. Doc. 8). The case was remanded back to the California Court of Appeal for reconsideration of the cause in light of

1  *People v. Black*, 41 Cal.4th 799 (Cal. 2007), on September 12, 2007.

2     The Court of Appeal issued a reasoned opinion on December 18, 2007, affirming Petitioner's

3  conviction in full and reversing its prior sentencing modification after concluding the trial court's

4  sentencing error was harmless.[1]

5     Petitioner filed a petition for review to the State high court on January 18, 2008. (Lod. Doc.

6  10). The California Supreme Court denied the petition for review on February 20, 2008. (Lod. Doc.

7  11).

8     Petitioner filed the instant petition for writ of habeas corpus with the federal court on May 19,

9  2008. Respondent filed an answer on September 11, 2008.

10                                  FACTUAL BACKGROUND[2]

11    Sabrina was born in 1983. Appellant was her stepfather and lived in her home while she was growing up.

12    Sabrina, who was 21 years old at the time of trial in August and September of 2005, testified that appellant began touching her inappropriately when she was seven or eight years old. Appellant began by rubbing her shoulders and back. He did not stop when she asked him to. He eventually began rubbing the sides of her breasts, the lower part of her buttocks, and, at times, her vagina. When Sabrina tried to get up and leave, appellant forced her to stay by telling her he would kill her mother and grandparents. On a couple of occasions, Sabrina complained to her mother about appellant touching her back and thighs, but appellant would tell Sabrina's mother that the two were just wrestling.

    During this same time period, appellant would unlock the bathroom door, come into the bathroom, and watch Sabrina while she showered. When Sabrina tried to get out of the shower, appellant would not let her. This behavior continued until after Sabrina's daughter was born in July of 2001.

    When Sabrina was in the fourth grade, appellant "wrestled" with her while she was in her bathing suit and inserted his thumb into her vagina. Sabrina testified that appellant would do this occasionally and she did not know how many times he had done it. By this time, appellant had stopped touching her breasts.

    Sabrina testified that appellant forced her to participate in oral copulation with him on a number of occasions. She could not recall how often this occurred because she tried to forget these incidents. Sabrina testified that appellant first forced her to orally copulate him during summer vacation between her fifth and sixth grade years in school. They were in Sabrina's mother's room, and when Sabrina tried to push

---

[1] Neither Petitioner nor Respondent have provided to this Court a copy of the California Court of Appeal's opinion issued on December 18, 2007. As it is the last reasoned opinion issued by the State courts, the Court takes judicial notice of the opinion, *People v. Miranda*, 2007 WL 4395114 (Cal. Ct. App. 2007).

[2] The factual background is derived from the factual summary set forth in the unpublished opinion of the California Court of Appeal, Fifth District issued on December 18, 2007. A determination of fact made by a state court is presumed correct, pursuant to 28 U.S.C. §§ 2254(e)(1), and must be rebutted by the petitioner with clear and convincing evidence.

appellant away, he threatened to kill her mother and grandparents. On another occasion, Sabrina testified that appellant made her orally copulate him in her mother's room just before she went to "SCICON," and appellant threatened to kill Sabrina's mother and grandparents if Sabrina told anyone about it. Sabrina also testified that on one occasion when she returned home from a swim party, appellant removed her bathing suit, placed her on the couch, spread her legs and stared at her. When Sabrina tried to move, appellant moved her back. He then kissed her vagina.

Sabrina did not recall how often appellant forced her to have sexual intercourse with him. She did recall that it began when she was a freshman in high school. Sabrina recalled one incident when appellant called her into her mother's room while he was watching television. Appellant told Sabrina to sit next to him on the bed. He then started to wrestle with her and removed her clothing until she was naked. Appellant forced himself into her. Sabrina tried to leave, but appellant held her down with his legs. When appellant got up and went into the bathroom, Sabrina ran into her own room. Appellant again threatened to kill her mother and grandparents if she told anyone.

Sabrina remembered that the last time appellant forced her to have intercourse with him was "around 2000" and she was a junior in high school. At the time, she was four months pregnant with her daughter, which appellant knew. Again, the incident occurred in her mother's bedroom, when her mother was not home. Appellant came into the room as Sabrina was walking out. He wrestled with her and took off her clothing. Sabrina tried to get away by "twisting, turning, pushing," but appellant held her down.

Following this incident, Sabrina ran to her best friend's house and told her that "Robert was being Robert." Sabrina told her friend everything that appellant had done to her except for the acts of sexual intercourse. Sabrina tried to tell her fiancé, the father of her child, but he did not want to know. He knew only that appellant had rubbed her back and watched her shower.

In June of 1999, Sabrina told her mother some of what appellant had been doing to her. Sabrina told her that appellant had touched the sides of her breasts and watched her shower. As a result, Sabrina's mother and appellant separated, and he left the house. Because Sabrina was afraid of appellant, she did not tell her mother that he had orally copulated her, forced her to orally copulate him, or that he had forced her to have sexual intercourse with him. Appellant had threatened Sabrina with a gun. Sabrina described appellant as having "a really bad anger problem."

Sabrina observed appellant's penis and testicles when he forced her to orally copulate him. She described appellant's penis as "crooked" and his testicles as "small."

Sabrina worked for appellant at a store because it "paid well" and she needed a job to care for her daughter. When she worked for appellant, Sabrina was never alone because her best friend, who was very protective of her, also worked for appellant. But appellant still occasionally rubbed her back while she was at work.

On January 12, 2005, Sabrina and her fiancé went to a restaurant to celebrate a birthday with another couple. While they were at the restaurant, the owner, Patrick Vejar, spoke to Sabrina about working there. Vejar gave Sabrina a tour of the restaurant, and while they were in the banquet room, Vejar kissed Sabrina and tried to shove his hand down her pants. He stopped when a bartender walked by and saw them.

As a result of this incident, Sabrina realized "something [she] should have realized a long time ago" and went "straight" to the police station and made a report about both Vejar and appellant.

Sabrina's mother, Mrs. Miranda, testified that she married appellant when Sabrina, her only child, was five years old. When Sabrina was a freshman in high school, Mrs. Miranda noticed that, for a period of about a month, appellant would get up early and go into Sabrina's bedroom. Mrs. Miranda told appellant on two occasions

to stop, but he claimed he was "just trying to help" by waking her for school.

Shortly thereafter, Mrs. Miranda asked Sabrina if she was uncomfortable around appellant, and Sabrina told her that appellant would come into her room, take her shirt off, and rub her back, breasts, buttocks and pubic area. When he touched her breasts or pubic area, he would say his hand "slipped." Sabrina also told her mother that appellant would watch her shower, take her clothes and hide them from her, and look at her private parts while wrestling with her.

When Mrs. Miranda confronted appellant about his sexual abuse of Sabrina, he denied it and argued that Sabrina was lying. He eventually admitted that he had touched Sabrina, claiming that, while he rubbed Sabrina's back, his hands would slip, causing him to rub her breasts and pubic area. Appellant admitted to his wife that he wrestled with Sabrina while she was naked and that he would spread her legs and look at her private parts. Appellant also admitted that he unlocked the bathroom door to watch Sabrina shower and that he would hide her clothes. Appellant told his wife, " 'I don't know why I did it. I don't know what's wrong with me.' "

After appellant admitted his abuse of Sabrina, Mrs. Miranda told appellant to move out. Two to three weeks later, after appellant promised never to touch Sabrina again, Mrs. Miranda allowed him to move back in. Mrs. Miranda testified that Sabrina was adamantly against appellant moving back in, but she promised she would be vigilant and would not let appellant touch Sabrina again.

Sometime while Sabrina was in high school, Mrs. Miranda met with a school counselor about rumors or complaints that appellant had molested Sabrina. Eventually, Sabrina denied the accusations.

Mrs. Miranda testified that, sometime after 1999, Sabrina worked for appellant at a service station and store. In August of 2004, Sabrina came home from work and told her mother she was going to quit because appellant was trying to rub her back and shoulders, which made her uncomfortable. Sabrina repeatedly tried to tell appellant to stop, but he wouldn't. As a result, Mrs. Miranda again told appellant to leave the house. Mrs. Miranda described appellant as having a "bad temper."

Mrs. Miranda testified that appellant obtained a gun in 1999. According to Mrs. Miranda, appellant handled the gun recklessly and on occasion would say he heard something, load the gun, and walk through the house with it. Mrs. Miranda testified that appellant pointed the gun at her while he played with it, but he did not threaten her with it. He also told Mrs. Miranda that there was a bullet meant for him and one meant for Sabrina's fiancé, with whom he was not pleased when Sabrina became pregnant.

Mrs. Miranda described appellant's penis as "slightly crooked" and his testicles as "small." She had never shared this information with Sabrina.

Mrs. Miranda testified that appellant never hit her or Sabrina, but she did see him rub Sabrina's shoulders when she was young and wrestle with her when she was six or seven years old.

Katherine Powell testified that she had been friends with Sabrina since they were in the fifth grade. Powell thought of Sabrina as a sister and considered her a truthful person. At first, Powell thought Sabrina was very outgoing, but her behavior changed, and she became shy and less outgoing.

In the summer of 1999, Sabrina came to Powell's house. She was crying hysterically and could barely breathe or talk. Sabrina told Powell appellant had been touching her breasts and watching her in the shower. Powell told Sabrina to tell her mom, but Sabrina was afraid of appellant. Sabrina spent a lot of time at Powell's because she did not want to be home. Powell thought Sabrina "seemed a lot better" when her mother and appellant first separated.

Powell worked with Sabrina at the service station and store. On one occasion, Powell saw appellant, who was the store manager, rubbing Sabrina's lower back and upper buttocks when the two were bent over the store's computer.

In 2004, Sabrina again talked to Powell about appellant. Sabrina was

hysterical and could not breathe, but she eventually described what had happened. Sabrina had spoken to her mother before talking to Powell.

Jaclene Cartlidge, a good friend of Sabrina's while they were in the sixth grade, testified that Sabrina was very upset at school one day. Cartlidge followed her into the bathroom where Sabrina described an incident that had happened to her. Afterwards, Sabrina spoke to a school official, as did Sabrina's parents, but Sabrina later changed the statement she had made to Cartlidge. Cartlidge told someone, perhaps a peer, about what had happened, but she did not tell any school officials about the incident.

***Defense***

Appellant testified in his own behalf. He denied sexually assaulting Sabrina and had various explanations for his actions. According to appellant, Sabrina was often sick. On one occasion, when Sabrina was sick on the couch, he rubbed her stomach under her shirt. As he did, he touched the top of her pubic hair with his little finger, which he described as crooked. He immediately apologized to Sabrina, but she said it was okay, so he continued to rub her stomach.

Appellant testified that Sabrina was in a car accident in July of 2001, and on occasion, he would rub her back because it hurt. He also rubbed her buttocks area, because she complained about pain in her lower back.

Appellant testified that he and Sabrina shared back rubs when they watched television. He would rub her back for 15 minutes, and then she would do the same for him. Appellant denied ever touching Sabrina's breasts. He also denied ever orally copulating her, having her orally copulate him, or having sexual intercourse with her.

Appellant recalled the incident which led to his wife asking him to leave the house in June of 1999. According to appellant, he was not feeling well and came home from work to go to bed. When he entered the room, he found Sabrina under the covers watching television. Appellant asked Sabrina to leave, but she wouldn't. He told her that if she did not get out of bed, he would "pants" her. When Sabrina just laughed, appellant reached under the blanket and pulled off her shorts. When she still would not get up, he pulled the blanket off of her. She had nothing on but a T-shirt. Appellant then picked her up, carried her to the living room, where he dropped her, grabbed her legs and started spinning her around, thinking it was a game. He stopped when Sabrina asked him to. Sabrina left to take a shower, and appellant picked the lock on the bathroom door and followed her in. He talked to her while she showered and he could see her entire body.

Appellant recalled another time when he pulled down Sabrina's pants, but not her underwear. He recalled another time when he entered the bathroom while Sabrina was showering, because she needed some shampoo. He also recalled a time when he picked her up by the pant leg and the button on her jeans broke. He then told her to take off her pants so he could sew the button back on.

Appellant testified that three weeks after his wife first asked him to leave, he met with her and asked if he could come back. He promised not to rub Sabrina's back or "anything of that nature." His wife asked Sabrina if it was okay and she said she didn't care. But after he returned, Sabrina asked if he would rub her back. He did when his wife did not object. Appellant admitted that there were times when he would come up behind Sabrina and rub her shoulders.

Appellant denied he ever threatened his wife or Sabrina with the gun. He acknowledged that he did tell Sabrina's fiancé he had a bullet he would use on him if he ever got Sabrina pregnant but denied he intended to shoot him.

In July or August of 2004, appellant's wife asked him about an incident that Sabrina related in which appellant pressed on Sabrina's back and got an erection. Appellant admitted to his wife that on one occasion he passed Sabrina's bedroom and saw that she was lying on the bed with a hurt back. While he rubbed her back, he got

an erection. This embarrassed him, and he left to put on some shorts because he was only wearing boxers at the time.

Appellant testified that he was ashamed and felt guilty about the bedroom and bathroom incidents, but denied he ever touched Sabrina in a sexual manner. Appellant admitted that his penis always "goes to one side," and that his right testicle is bigger than the left one. But, according to appellant, these aspects of his body were discussed in front of Sabrina as his wife called him "little balls."

In February of 2005, during the investigation of the matter, Mrs. Miranda made a pretext telephone call to appellant. Appellant acknowledged that, during the call, he admitted he had touched Sabrina's breasts. He admitted the same during an interview with law enforcement. But appellant explained that he only rubbed Sabrina's chest in the area between her nipples.

During the call, appellant tried to explain to his wife why Sabrina knew of his genital defects, thinking that his penis must have fallen out of his boxers while he was jumping up and down in the living room with Sabrina, when he opened the door for Sabrina while wearing white briefs, or when he was rubbing her back and got an erection.

Also, during the same telephone call, appellant told his wife that while he was spinning Sabrina around by her legs, he looked down and noticed that she was a virgin.

Appellant did recall that he and his wife had spoken to a school counselor when Sabrina was in the sixth grade about rumors that he was molesting Sabrina. According to appellant, Sabrina had accused the deacon of their church, who was a friend of theirs, of touching her breasts, but appellant had not taken any action in response to this allegation.

Appellant called several character witnesses. Mike Buford, appellant's supervisor from the late 1980's until December of 1999, described appellant as an honest and truthful person with a good reputation in the workplace. Job Aleman, a church friend since 1998, testified that appellant had a reputation for being truthful and honest, but admitted he had not seen appellant in church for a couple of years. Bud Zontek worked with appellant for 15 years and described him as truthful and honest in the workplace and among his coworkers.

Joseph Sousa, appellant's godchild, testified that Sabrina had a reputation for being dishonest, untruthful, and manipulative. He also testified that Sabrina drank a lot. Sousa admitted that he had tried to date Sabrina, but she had refused.

Police Officer Brian Cordeniz testified that he met with Sabrina on January 13, 2005, when she walked into the police station to make a complaint of a sexual battery. Officer Cordeniz described Sabrina as upset and crying. He could smell alcohol on her, but did not believe that she was intoxicated. Sabrina told Officer Cordeniz that, a few hours earlier, she had gone to Vejar's restaurant with friends when the owner, Patrick Vejar, came up to her and suggested she apply for a bartending position. When Vejar took Sabrina on a tour of the restaurant, he kissed her. Sabrina pulled away, and Vejar asked her if she had breast implants and injections in her buttocks. When she told him it was none of his business, Vejar grabbed Sabrina around the buttocks and reached down the front of her pants with his left hand. Sabrina walked away and told her friends what had happened. The friends confronted Vejar, but he denied the incident occurred. Sabrina told Officer Cordeniz she wanted to file charges against Vejar.

Sabrina then told Officer Cordeniz that appellant had started molesting her when she was in the third grade and he would watch her take showers. She also described him placing his finger into her vagina. Sabrina told Officer Cordeniz that appellant forced her to perform oral sex on him when she was in the sixth grade, to receive oral sex, and that appellant forced her to have sexual intercourse with him several times. Sabrina related that appellant threatened to kill her mother and grandparents if she ever disclosed what was going on.

*People v. Miranda*, 2007 WL 4395114 *1-7.

**DISCUSSION**

**I.    Jurisdiction and Venue**

A person in custody pursuant to the judgment of a state court may petition a district court for relief by way of a writ of habeas corpus if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); *Williams v. Taylor*, 529 U.S. 362, 375 n.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution and that his custody arises from a judgment of the Tulare County Superior Court. An application for writ of habeas corpus may be filed in the district court where Petitioner was sentenced or the district court where Petitioner is currently incarcerated. *See* 28 U.S.C. § 2241(d). Petitioner was sentenced in Tulare County, which is in this judicial district pursuant to 28 U.S.C. section 84(b). Thus, the Court has jurisdiction over and is the proper venue for this action.

**II.    ADEPA Standard of Review**

In April 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for a writ of habeas corpus filed after the statute's enactment. *Lindh v. Murphy*, 521 U.S. 320, 326-327 (1997); *Jeffries v. Wood*, 114 F.3d 1484, 1499 (9th Cir. 1997), *cert. denied*, 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 769 (5th Cir. 1996), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other grounds by Lindh*, 521 U.S. 320 (holding AEDPA only applicable to cases filed after statute's enactment)). The instant petition was filed in 2008 and is consequently governed by AEDPA's provisions, which became effective upon its enactment on April 24, 1996. *Lockyer v. Andrade*, 538 U.S. 63, 70 (2003).

As Petitioner is in custody pursuant to a State court judgment, Title 28 U.S.C. section 2254 remains the exclusive vehicle for Petitioner's habeas petition. *Sass v. California Board of Prison Terms*, 461 F.3d 1123, 1126-1127 (9th Cir. 2006) (quoting *White v. Lambert*, 370 F.3d 1002, 1006 (9th Cir. 2004) in holding that § 2254 is the exclusive vehicle for a habeas petitioner in custody pursuant to a State court judgment even where the petitioner is not challenging his underlying State court conviction). Under AEDPA, a petition for habeas corpus "may be granted only if [Petitioner]

U.S. District Court
E. D. California

7

demonstrates that the state court decision denying relief was 'contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.'" *Irons v. Carey*, 505 F.3d 846, 850 (9th Cir. 2007) (quoting 28 U.S.C. § 2254(d)(1)); *see Lockyer*, 538 U.S. at 70-71.

As a threshold matter, this Court must "first decide what constitutes 'clearly established federal law, as determined by the Supreme Court of the United States.'" *Lockyer*, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Id.* (quoting *Williams*, 592 U.S. at 412). "In other words, 'clearly established federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Id.*

Finally, this Court must consider whether the State court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law." *Lockyer*, 538 U.S. at 72, (quoting 28 U.S.C. § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413; *see also Lockyer*, 538 U.S. at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the State court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

Petitioner bears the burden of establishing that the State court's decision is contrary to or involved an unreasonable application of United States Supreme Court precedent. *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth

Circuit precedent remains relevant persuasive authority in determining whether a State court decision is objectively unreasonable. *See Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003); *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 1999).

AEDPA requires that a federal habeas court give considerable deference to State court decisions. The State court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). Furthermore, a federal habeas court is bound by a State's interpretation of its own laws. *Souch v. Schaivo*, 289 F.3d 616, 621 (9th Cir. 2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

### III.     Review of Petitioner's Claim

The petition for writ of habeas corpus sets forth three grounds for relief.

#### *A.     Ground One: Right to Compulsory Process*

Petitioner contends that his Sixth Amendment right to compulsory process for obtaining witnesses in his favor was violated by "the trial court's overly energetic advisement of the Fifth Amendment right, and the pretext arrest of Vejar." (Pet. M. & A. at 26).

"[T]he [United States] Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citations omitted). The Sixth Amendment's Compulsory Process Clause preserves the right of a criminal defendant to have compulsory process for obtaining a favorable witness. *Washington v. Texas*, 388 U.S. 14, 18-19 (1967) (applying this right to State criminal prosecutions through the Fourteenth Amendment). A criminal defendant's Sixth Amendment right to compulsory process for obtaining witnesses in his favor is thus clearly established in Supreme Court precedent. *See Chambers v. Mississippi*, 510 U.S. 284, 302 (1973) (stating that "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense"); *see also Washington v. Texas*, 388 U.S. at 22 (right to compulsory process is violated where the State arbitrarily denies a criminal defendant the right to put on the stand a witness who is capable of testifying and whose testimony would have been relevant and material to the defense).

However neither *Chambers* nor *Washington* "involved a witness's invocation of his Fifth Amendment privilege against self-incrimination." *Arrendondo v. Ortiz*, 365 F.3d 778, 782 (9th Cir.

2004) (upholding the trial court's exclusion of witness who invoked Fifth Amendment).  The Court's review of existing federal law reveals scant authority supporting Petitioner's proposition that a trial judge's "overly energetic advisement" of a witnesses' Fifth Amendment right violates a criminal defendant's rights under the Sixth Amendment.  *See Davis v. Straub*, 430 F.3d 281, 288-290 (6th Cir. 2005) (noting that Supreme Court precedents in *Washington v. Texas* and *Hoffman v. United States*, 341 U.S. 479 (1951) have not addressed how a court is to resolve conflicting tensions between a witness's Fifth Amendment right against self-incrimination and a defendant's right to present witnesses in his favor).  While Supreme Court precedents forbid a trial court from coercing a witness not to testify by issuing threats, such a precedent is distinguishable from the current case.  *See Webb v. Texas*, 409 U.S. 95, 96 (1972) (per curiam) (holding that trial judge's statements to a witness deprived the habeas petitioner of a defense by coercing the sole defense witness into refusing to testify); *see also United States v. Jaeger*, 538 F.3d 1227, 1231 (9th Cir. 2008) (citing *Webb*, 409 U.S. at 98, in stating that "a judge's admonition can be so threatening as to interfere with a witness' testimony and 'effectively dr[i]ve that witness off the stand' in violation of a defendant's constitutional rights'").  The Court notes however that *Webb* and its subsequent case law regard a judge's admonitions to a witness regarding potential perjury by the witness and do not address a court's advisement of a witness' Fifth Amendment rights.

        Even assuming that *Webb* applies, there still exists several distinctions between *Webb* and the current case.  After being called to the witness stand, the following exchange occurred between the witness and the trial court:

> THE COURT: All right.  Mr. Vejar, you have been subpoenaed by [Defense Counsel] to testify in the case involving the People of the State of California versus Robert Lee Miranda.  From my understanding, you are going to be asked some questions regarding an alleged incident which occurred between you and a Ms. Kelsay.  And my understanding is that you are going to be arrested today regarding that incident.  And Detective Haney is going to be taking you into custody and you are–that you've been subpoenaed to testify on.
> You have the right to remain silent. You have the Fifth Amendment privilege not to testify and incriminate yourself.  And you have the right to an attorney, the right to hire an attorney.  If you cannot afford an attorney, one would be appointed for you at no charge during any questioning.
> And so I want to ask you, knowing that you're going to be arrested today on the charges that you've been subpoenaed to testify on, do you wish to invoke your Fifth Amendment privilege not to testify?
> THE WITNESS: I'm under oath.  I'll testify.

> THE COURT: You understand that everything you say can and will be used against you in a court of law and you wish to testify without talking to a lawyer?
> THE WITNESS: If I'm being arrested, I think I better talk to a lawyer.
> THE COURT: So are you invoking your Fifth Amendment privilege not to tesify?
> THE WITNESS: Yes, sir.
> THE COURT: All right. I'm going to excuse–understand, Mr. Vejar, I'm not making any findings here whether this happened or not. I'm just telling you that you're going to be arrested...

(Lod. Doc. 12, RT, Vol. 4, at 381-382)

The first difference between *Webb* and the present case is that unlike in *Webb*, Vejar was not the only defense witness nor was he the only defense witness on Sabrina's credibility. Secondly, the trial court here stopped at warning the witness of his rights. The court did not threaten to personally see to it that the witness be prosecuted for perjury should the witness testify. "A defendant's constitutional rights are implicated only where the prosecutor or trial judge employs coercive or intimidating language or tactics that substantially interfere with a defense witness' decision whether to testify." *United States v. Vavages*, 151 F.3d 1185, 1189-1190 (9th Cir. 1998) (citing *United States v. Harlin*, 539 F.2d 679, 681 (9th Cir. 1976) and *United States v. Davis*, 974 F.2d 182, 187 (D.C. Cir. 1992)). As highlighted by the appellate court's decision, the trial court did not threaten the witness with arrest if he testified nor did he warn him against testifying; rather, the court merely advised the witness of his rights. Nothing in the trial court's statements to Vejar implied that the arrest was contingent on whether Vejar testified–unlike in *Webb* where the judge stated that if the witness testified and committed perjury, the judge would personally see to it that the witness was prosecuted. Furthermore, the trial court's statements were more similar to the statements approved of in *Jaeger* as they were "brief, factual, and explanatory; they were mildly worded; they were designed to allow [the witness] to make [his] own decision...rather than impose a decision on [him]." *Jaeger*, 538 F.3d at 1232. Thus, the Court does not find that the trial court's advisement of Vejar's Fifth Amendment rights violated Petitioner's right to call witnesses in his favor.

Petitioner also argues that the pretextual arrest of Vejar violated his right to call witnesses in his favor. The appellate court rejected this argument, finding that "[t]here is also no proof in the record before this court that the prosecution or law enforcement used Vejar's arrest to prevent him from testifying." *Miranda*, 2007 WL 4395114 * 12. In federal habeas corpus proceedings, a

presumption exists that the State court's factual findings were correct. 28 U.S.C. § 2254(e)(1). Petitioner bears the burden of rebutting this presumption with clear and convincing evidence. *Id*. Here, the State court concluded that the arrest was not pretextual, choosing to find that non-pretextual reasons existed and that those reasons were more credible than the version of events presented by Petitioner. Petitioner himself has presented no clear and convincing evidence to rebut the State court's finding, instead relying on his own assertions that the government's motive was pretextual. *See Nunes v. Ramirez-Palmer*, 485 F.3d 432, 440 (9th Cir. 2007) (stating that, "[t]o the extent that any of [Petitioner]'s assertions can be considered evidence, collectively they do not rise to the heightened level of the 'clear and convincing evidence' necessary to overcome the presumption that the state appellate court's ruling was correct"). Accepting that the arrest was not pretextual, Petitioner's contention fails to provide a basis upon which this Court may grant relief.

### B.   *Ground Two: Sufficiency of the Evidence*

In his second ground for relief, Petitioner contends that his constitutional rights were violated because insufficient evidence was presented at trial to support his conviction for a third count of forcible oral copulation. Specifically, Petitioner contends that there is insufficient evidence that this offense occurred within the ten year statute of limitations period.

This claim was presented on direct appeal to the California Court of Appeal, Fifth Appellate District. The state appellate court issued a reasoned decision affirming Petitioner's conviction and rejecting his sufficiency of the evidence claim. Petitioner's subsequent petition for review before the California Supreme Court was summarily denied. Thus, the Court "look[s] through" the summary disposition to the last reasoned decision and presumes that the California Supreme Court adjudicated this claim for the same reasons as those cited by the California Court of Appeal in their reasoned denial of Petitioner's claim. *See Ylst v. Nunnemaker*, 501 U.S. at 803.

In reviewing sufficiency of evidence claims, California courts expressly follow the standard articulated by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307 (1979). *See People v. Smith*, 37 Cal.4th 733, 738-739 (Cal. 2005); *see also People v. Catlin*, 26 Cal.4th 81, 139 (Cal. 2001). "A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds."

*Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005) (noting under AEDPA, a petition for habeas corpus may only be granted where the state court's application of *Jackson* was objectively unreasonable), *cert. denied*, *Allen v. Juan H.*, 546 U.S. 1137 (2006).  Pursuant to the Supreme Court's holding in *Jackson*, the test to determine whether a factual finding is fairly supported by the record is as follows, "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson*, 443 U.S. at 319; *see also Lewis v. Jeffers*, 497 U.S. 764, 781 (1990).

Sufficiency of evidence claims are judged by "the substantive elements of the criminal offense as defined by state law."  *Jackson*, 443 U.S. at 324, n. 16.  Furthermore, this Court must presume the correctness of the state court's factual findings.  28 U.S.C. § 2254(e)(1); *Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986).  This presumption of correctness applies to State appellate determinations of fact as well as those of the State trial courts.  *Tinsley v. Borg*, 895 F.2d 520, 525 (9th Cir. 1990).  Although the presumption of correctness does not apply to State court determinations of legal questions or to mixed questions of law and fact, the State court's factual findings underlying those determinations are entitled to the same presumption.  *Sumner v. Mata*, 455 U.S. 539, 597 (1981).

Petitioner alleges that the evidence was insufficient as to the third count of forcible oral copulation (Count Five) because of a lack of evidence to support the conclusion that the incident charged in the verdict form occurred within the ten year statute of limitations.  (Pet. M. & A. at 34). However, this argument misconstrues the testimony of the victim.  Noting that the evidence is to be reviewed in the light most favorable to the prosecution, the Court does not find the appellate court's decision to be an unreasonable application of *Jackson*.  Here, as summarized by the appellate court, the evidence of a third incident consisted of the victim's testimony.  The appellate court carefully examined the evidence produced from the victim's testimony, stating that:

> With respect to the oral copulation alleged in count 5, the evidence shows the following. The prosecutor asked Sabrina, "Now, you described two events of oral copulation where your head was forced down on [appellant]'s penis, was there ever a time when he kissed you in the vaginal area?" Sabrina then testified to an incident which took place "the same day of the birthday party of Crystal's." On that occasion, appellant took off her bathing suit, laid her down on the couch, spread her legs open, stared at her, and then kissed her on her "private part." Officer Cordeniz also testified

> that Sabrina told him she was in the sixth grade when appellant forced her to receive oral sex. Although the prosecutor argued during closing argument that this incident occurred when Sabrina was 14 years old, which would be sometime in 1997 or 1998, the date is not mentioned in the evidence

*Miranda*, 2007 WL 4395114 *13.

Additionally, the appellate court's decision also reveals that there exists sufficient evidence to support the jury's finding that the third incident of forcible oral copulation occured within the ten year statute of limitations period, noting that:

> Sabrina testified that the first incident involving oral copulation occurred in the summer of 1995, followed by another in the fall of that same year, it was reasonable for the jury to conclude the bathing suit incident, another act of oral copulation which took place in the living room and involved appellant removing Sabrina's clothing, happened sometime late in 1995 and before 1999, when appellant began having sexual intercourse with her. We note, in addition, that Officer Cordeniz testified that Sabrina told him she was in the sixth grade when this act of oral copulation occurred.

*Id*. at 14.

While the State court does not explicitly mention the *Jackson* standard, the Court of Appeal decision reveals that there exists sufficient evidence to support Petitioner's conviction for violating California Penal Code section 288a(c). Specifically, the testimony by the victim would permit a reasonable juror to have found beyond a reasonable doubt the elements of the crime. *See People v. Guido*, 125 Cal.App.4th 566, (Cal. Ct. App. 2005) (element of force "is proven when a jury finds beyond a reasonable doubt that defendant accomplished an act of oral copulation by the use of force sufficient to overcome the victim's will"); *People v. Hunter*, 159 Cal.App.2d 500, 505 (Cal. Ct. App. 1958) (noting that "[a] person is guilty of violating the statute when he has placed his mouth upon the genital organ of another"). Here, the victim testified during direct examination of two instances of forcible oral copulation. (Lod. Doc. 12, RT, Vol. 1, at 31-34). The victim further testified during redirect about the third incident. (Id. at 96). It is clear that there was sufficient evidence that the incident occurred within the ten year statute of limitations as the victim testified that the first incident of oral copulation occurred when she was in the sixth grade. (*See* id. at 31). This testimony would permit the inference that the third incident occurred following this time and would similar to the first instance fall within the ten year statute of limitations.

Petitioner alleges that the third incident was a "pantsing" incident, where Petitioner took off

the victim's shorts and spun her around but did not orally copulate her. (Id. at 220-222). Petitioner denies ever having orally copulated the victim. (Id. at 243). In examining conflicting testimonies, we must presume that the trier of fact resolved conflicting inferences in favor of the prosecution. *Jackson*, 443 U.S. at 326. Consequently, the Court does not find that the California Court of Appeal's decision was an "objectively unreasonable" application of *Jackson* to the facts of this case. *See Juan H.*, 408 F.3d at 1275 n. 13.

### C.     Ground Three: Sentencing Error

Petitioner contends that his Sixth and Fourteenth Amendment rights were violated by the trial court's imposition of the upper term for the felony rape count.[3] Petitioner raised this claim to the California Court of Appeal, which issued reasoned opinions in March and December 2007. The latter opinion is the last reasoned opinion issued by a State court as the California Supreme Court summarily denied the petition for review submitted before the court in February 2008. When reviewing a State court's summary denial, the Court "look[s] through" the summary disposition to the last reasoned decision; thus, the Court presumes that the California Supreme Court adjudicated Petitioner's claim for the same reasons cited by the California Court of Appeal in their reasoned decision. *See Ylst v. Nunnemaker*, 501 U.S. at 803.

Respondent argues that this claim is moot as the Court of Appeal has already granted Petitioner the relief he currently seeks from this Court. The appellate court vacated Petitioner's sentence on the count of felony rape in its first reasoned decision issued in March 2007. However, the Court of Appeal subsequently found that the trial court's sentencing error was harmless and rescinded the modified sentence in its December 2007 decision. Thus, Petitioner's claim that his Sixth and Fourteenth Amendment rights were violated by the trial court's imposition of the upper term is not moot as the appellate court rescinded its decision providing Petitioner relief.

Petitioner argues that the trial court's actions violated clearly established federal law, as set

---

[3] The United States Supreme Court has previously stated that, "the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Jones v. United States*, 526 U.S. 227, 246 n. 6) (1999). In *Apprendi v. New Jersey*, 530 U.S. 466, 475 (2000), the Supreme Court recognized that "[t]he Fourteenth Amendment commands the same answer."

forth in *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and its progeny, as the trial court imposed the upper term based upon facts not found by a jury. In *Apprendi*, the United States Supreme Court overturned a state sentencing scheme as violative of a criminal defendant's right to have a jury verdict based on proof beyond a reasonable doubt. The sentencing scheme permitted a trial judge to enhance a defendant's penalty beyond the prescribed statutory maximum upon a finding by a preponderance of the evidence that the defendant committed the crime with racial animus. *Id*. at 469. The Supreme Court held that the Sixth Amendment right to a jury trial required that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490. In *Blakely v. Washington*, 542 U.S. 296, 303-304 (2004), the high court explained that the "statutory maximum" is the maximum sentence a judge may impose based exclusively on the facts reflected in the jury verdict or admitted by the defendant and not the maximum sentence a judge may impose after finding additional facts.

The United States Supreme Court subsequently found that the imposition of upper terms, as delineated in California's Determinate Sentencing Law, based solely on facts found by a judge constituted a violation of a criminal defendant's constitutional rights. *See Cunningham v. California*, 549 U.S. 270, 293 (2007) (overruling *People v. Black*, 35 Cal.4th 1238 (Cal. 2005)). The *Cunningham* court noted that the middle term specified in California's statutes was the relevant statutory maximum for the purpose of applying *Blakely* and *Apprendi*. Thus the imposition of the upper term based solely upon a trial judge's fact finding violates a defendant's Sixth and Fourteenth Amendment rights because it "assigns to the trial judge, not the jury, authority to find facts that expose a defendant to an elevated 'upper term' sentence." *Id.* at 274.

The California Court of Appeal, the last State court to issue a reasoned opinion, recognized the standard set forth in *Cunningham* in finding that Petitioner's Sixth Amendment right to a jury trial was violated. The Court of Appeal noted that:

> The trial court relied on the following factors in sentencing appellant to the upper term of eight years on count 2: "this crime involved violence and a threat of great bodily harm on the victim or others disclosing a high degree of cruelty, viciousness, and callousness.... The victim was particularly vulnerable.... The manner in which the crimes were carried out indicated planning, sophistication, and professionalism.... [Appellant] took an advantage of a position of trust or confidence to commit the offense ... [and] [t]hose facts greatly outweigh the mitigating factor of

       no criminal record."
           None of these factors relied upon by the trial court was found by a jury beyond a reasonable doubt. (See Blakely, supra, 542 U.S. at p. 301; Apprendi, supra, 530 U.S. at p. 490.) It follows that the trial court's imposition of the upper term violated appellant's Sixth Amendment right to a jury trial. We next consider whether this federal constitutional error is harmless beyond a reasonable doubt.

*People v. Miranda*, 2007 WL 4395114 *18.

However, the State court ultimately concluded that this error was harmless as the court found that the evidence at trial would have lead a jury to have found two of the aggravating factors beyond a reasonable doubt. *Id*. Specifically, the Court of Appeal pointed to the victim's particularly vulnerability and Petitioner taking advantage of his position of trust or confidence to commit the offense.

Petitioner challenges the appellate court's conclusion of harmlessness on two grounds. The first challenges the evidentiary basis of the court's conclusion. The second argues that such an error can never be deemed harmless. Petitioner's second contention conflicts with the Ninth Circuit's decision in *Butler v. Curry*, 528 F.3d 624 (9th Cir. 2008), which held that even upon a finding that a habeas petitioner's constitutional rights were violated:

> [Petitioner] is entitled to relief only if the sentencing error in his case is not harmless. See Washington v. Recuenco, 548 U.S. 212, 126 S.Ct. 2546, 2552, 165 L.Ed.2d 466 (2006) (holding that sentencing errors are subject to harmless error analysis). Applying Brecht v. Abrahamson, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), we must determine whether "the error had a substantial and injurious effect on [Butler's] sentence." Hoffman v. Arave, 236 F.3d 523, 540 (9th Cir.2001) (internal quotation marks omitted). Under that standard, we must grant relief if we are in "grave doubt" as to whether a jury would have found the relevant aggravating factors beyond a reasonable doubt. O'Neal v. McAninch, 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). Grave doubt exists when, "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." Id. at 435., 115 S.Ct. 992.

*Id*. at 648. As stated in *Butler*, a sentencing error under *Apprendi* is subject to a harmless error analysis.

The dispositive question now before this Court is whether the State court's conclusion, that the error was harmless, was objectively unreasonable in light of clearly established federal law. In terms of reviewing the trial court's imposition of the upper term, "the relevant question is not what the trial court *would* have done, but what it legally *could* have done." *Butler*, 528 F.3d at 648-649 (emphasis in original). Under California law, only that one aggravating factor is requires to be

proven in order to authorize the imposition of the upper term. Having carefully reviewed the record, the Court is persuaded that the error was harmless as one of the two of the aggravating factors would have been found by a jury beyond a reasonable doubt; therefore, making it permissible for the trial court to have relied upon this factor to impose the upper term.[4]

California considers the particular vulnerability of a victim as an aggravating factor in sentencing. Cal. Ct. R. 4.421(a)(3). "Under California law, vulnerable means 'defenseless, unguarded, unprotected, accessible, assailable, one who is susceptible to the defendant's criminal act.'" *Butler*, 528 F.3d at 649 (quoting *People v. Weaver*, 149 Cal.App.4th 1301, 1314 (Cal. Ct. App. 2007) (quoting *People v. Smith*, 94 Cal.App.3d 433, 435 (Cal. Ct. App. 1979))). As emphasized by the Ninth Circuit, the victim must be *particularly* vulnerable as compared to other victims of the same crime. *Id*. at 650. Here, the California Court of Appeal pointed to two factors that made the victim particularly vulnerable–specifically, Petitioner's status as the victim's stepfather and the age of the victim during the commission of the crime–when compared to other victims of felony rape. *See People v. Bishop*, 158 Cal.App.3d 373, 378-379 (Cal. Ct. App. 1984) (holding that evidence shows victims were particularly vulnerable as they were young teenagers, age 15 and 17, of small stature). Here, the Court notes that the victim testified that the rapes began when she was a freshman in high school, which would have made her of the same age as the victims in *Bishop*. An additional fact that was undisputed was that the victim lived in Petitioner's home, a fact that made her particularly defenseless and susceptible to Petitioner's criminal conduct. *See People v. Clark*, 50 Cal.3d 583, 638 (Cal. 1990) (upholding finding that victim of rape was particularly vulnerable as defendant abused his position of trust from prior relationship by misleading the victim to gain entrance into her home, "where she was alone, unprotected, and unable to protect herself from the assault"); *see also People v. Stitley*, 35 Cal.4th 514, 574-575 (Cal. 2005) (holding that trial court

---

[4] As only one aggravating factor needs to be proven to impose the upper term, the Court does not address the appellate court's findings with regards to the second aggravating factor. The Court notes, however, that California considers a criminal defendant taking advantage of a position of trust or confidence to commit the offense an aggravating factor. Cal. Ct. R. 4.421(a)(11). Here, it was undisputed at trial that Petitioner was the victim's stepfather, a position of trust or confidence. It is obvious to the Court that Petitioner took advantage of that position by committing his criminal conduct in the home. Further, Petitioner used his access to the victim's family by virtue of his position as her stepfather to prevent her from seeking aid or escaping by threatening to kill her mother and grandparents.

correctly cited aggravating factor of rape victim's particular vulnerability where the victim was relatively young, 16, pregnant, and depended on the defendant for shelter).

In sum, the appellate court was not objectively unreasonable in concluding that the *Apprendi* violation was harmless as the trial court could have imposed the upper term based on the finding that the victim was particularly vulnerable. *See United States v. Zepeda-Martinez*, 470 F.3d 909, 913 (9th Cir. 2006) (holding that the trial court's imposition enhanced term was harmless as the court relied on a fact supported by "overwhelming and uncontroverted evidence"). Consequently, Petitioner's third ground fails to provide a basis upon which this Court may grant Petitioner's request for habeas corpus relief.

## RECOMMENDATION

Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be DENIED WITH PREJUDICE and the Clerk of Court be DIRECTED to enter judgment for Respondent.

This Findings and Recommendation is submitted to the Honorable Anthony W. Ishii, United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California.

Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:   June 9, 2009**          /s/ John M. Dixon
                                   UNITED STATES MAGISTRATE JUDGE